**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**CHRISTY CORAN P/K/A "GANGSTA GOLD" AND LATONYA PIERCE P/K/A "MC MONEY"**

**Plaintiffs,**

**v.**

**CARLOS DUAN PERRY P/K/A DJ SOUND**

**Defendant.**

**Case No. ______________**

**JURY TRIAL DEMANDED.**

## VERIFIED COMPLAINT

Plaintiffs Christy Coran p/k/a "Gangsta Gold" ("Coran" or "Gangsta Gold") and Latonya Pierce p/k/a "MC Money" ("Pierce" or "MC Money") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Defendant Carlos Duan Perry p/k/a "DJ Sound" ("Perry" or "DJ Sound") and state as follows:

## NATURE OF THE ACTION

1. This action concerns music that MC Money and Gangsta Gold created in Memphis during the 1990s and the money it began generating decades later. Plaintiffs wrote and performed original lyrics and vocals on *Da Hard Ov Frayser* (the "Album"). Defendant Carlos Duan Perry, professionally known as DJ Sound, produced and recorded the Album. Plaintiffs were not Perry's employees, signed no work-made-for-hire agreement or assignment, and received the master materials to manufacture and sell the Album for their own account.

2. When contemporary phonk artists began sampling this music, Perry positioned himself as the catalog's gatekeeper. He licensed Plaintiffs' songs and recordings, collected fees, publishing

interests, and royalties, and authorized a commercial reissue of their Album without disclosing the complete terms or accounting for Plaintiffs' shares. One known 2024 transaction covered at least thirty sample clearances and included a $100,000 master-use fee plus a fifty-percent publishing interest in thirty new songs.

3. Perry eventually acknowledged that the catalog was making money and that Plaintiffs were entitled to payment. He made partial payments and participated in an accounting, but the process ended before he disclosed all relevant transactions, identified what he had received, or paid Plaintiffs the balance. Plaintiffs bring this action to establish their rights and recover the proceeds Perry received from exploiting their music.

4. Plaintiffs believe the partial payments represent only a small fraction of what they are owed and presently estimate their damages at no less than $500,000 and likely substantially more, subject to the accounting and discovery sought here.

## PARTIES

5. Plaintiff Christy Coran p/k/a Gangsta Gold is an individual residing in Shelby County, Tennessee.

6. Plaintiff Latonya Pierce p/k/a MC Money is an individual residing in Shelby County, Tennessee.

7. Upon information and belief, Defendant Carlos Duan Perry p/k/a DJ Sound resides in Shelby County, Tennessee.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1338(b), and under 15 U.S.C. § 1121, because Plaintiffs assert claims under the Copyright Act, 17 U.S.C. §§ 101, 103(b), and 201(a); the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the

Lanham Act, 15 U.S.C. § 1125(a)(1)(A). This Court has original jurisdiction under 28 U.S.C. § 1338(b) over Plaintiffs' claims of unfair competition, which are joined with substantial and related claims under the copyright and trademark laws.

9. This Court has supplemental jurisdiction over Plaintiffs' Tennessee-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiffs' federal copyright and Lanham Act claims.

10. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a) because Perry resides and may be found in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred here.

11. Assignment to the Western Division is proper because the parties reside in Shelby County and the acts and omissions alleged in this Complaint occurred principally in Shelby County, Tennessee.

## FACTUAL ALLEGATIONS

### A. Plaintiffs Created and Released *Da Hard Ov Frayser*

12. MC Money and Gangsta Gold are Memphis recording artists and songwriters. They contributed original lyrics, verses, vocal performances, and other original expression to recordings released by or associated with DJ Sound and the Frayser Click.

13. Perry is a Memphis producer, recording engineer, performer, and organizing figure associated with the Frayser Click. He has publicly described the group's collaborative process: Perry created, selected, sampled, arranged, or assembled production elements; recorded and mixed the sessions; and sometimes supplied hooks, vocals, or lyrics. Perry further explained that he would

"make the beat first" and then allow participating artists to "come back [and] put their stuff to it."[1] The participating artists supplied their own lyrics, verses, and vocal performances.

14. Plaintiffs worked with Perry in that manner. They wrote and finalized their own lyrics and verses, chose their phrasing and delivery, and controlled the expression they contributed. Perry did not write or rewrite their lyrics or hire them simply to perform material he authored. The parties intended to combine Plaintiffs' contributions with Perry's production and, where applicable, material supplied by other artists.

15. Perry has publicly described *Da Hard Ov Frayser* as the album he made "for MC Money and Gangsta Gold" and, more specifically, as Plaintiffs' "solo tape." Perry further acknowledged that, after completing the album, he gave Plaintiffs the master tape so they could manufacture and sell their own copies, telling them to "go get y'all money." These statements and actions objectively manifested Perry's contemporaneous understanding that *Da Hard Ov Frayser* was Plaintiffs' album, not merely a DJ Sound compilation on which Plaintiffs appeared, and that Plaintiffs were entitled to possess and commercially exploit the completed album for their own benefit.[2]

16. The cassette artwork reflected those separate roles. It prominently identified MC Money and Gangsta Gold as the recording artists and used the phrase "DJ Sound Presents" to identify Perry's role in presenting and producing the Album.

---

[1] *See* Al Kapone, *Memphis Rap History with the Frayser Legend DJ SOUND Hosted by Al Kapone*, YouTube, at 19:27–20:22 (June 7, 2026), https://www.youtube.com/watch?v=VR-iLQLWzF4.

[2] *See* Tha Gat Dam Channel, *DJ Sound Interview: He Discusses Recording Yo Gotti, the Frayser Click, & the Phonk Movement!*, YouTube, at 18:01–19:22 (Aug. 12, 2022), https://www.youtube.com/watch?v=xma2ZLYWEC4.

17. Plaintiffs manufactured cassette copies, sold them hand to hand in Memphis, placed them in local record stores, and kept the proceeds. Perry did not administer those sales, demand an accounting, claim a share, or say the sales were unauthorized.

18. The parties created the Album within the informal environment of the underground Memphis rap scene of the 1990s. They did not use written artist or producer agreements, split sheets, or a centralized royalty-accounting system.

19. Neither Plaintiff was Perry's employee. Neither signed a work-made-for-hire agreement, assigned her copyright interests to Perry, or gave him an exclusive license. No written instrument gave Perry exclusive ownership or control of Plaintiffs' interests.

20. Perry retained copies of original tapes, multitrack recordings, and other source materials. He has publicly described using retained source recordings to isolate instrumentals and a cappella vocals, remaster old recordings, and create additional versions. His possession of those physical materials did not reflect any agreement that he alone owned the copyrights embodied in them.

21. Plaintiffs contributed original lyrics, songwriting, recorded vocals, or other copyrightable expression to each of the following tracks on the album: a. "Ridgecrest Anthem"; b. "Down With the Click"; c. "Glock-Tight Smoked-Out"; d. "Ridgecrest Taking Over"; e. "Dead in His Tracks"; f. "I Just Need Yo Cheese"; g. "Load Da Ammo"; h. "Shouts Out"; and i. "Bout Our Hogg."

22. Upon information and belief, Plaintiffs' creative contributions are also embodied in numerous additional DJ Sound and Frayser Click Works that have been sampled, repurposed, reissued, licensed, incorporated into later recordings, or otherwise commercially exploited. Those Works include, but are not limited to, "Kickin N Doors," "Cross the Click," "Broken Halo," "Choky Choke," "Watch Out for Da Click," "Real Niggaz," "Broke Niggaz," "Fuckin Wit Da Killaz," "Stalkin' With Da Yalk," and "Frayser Is My Area."

23. As used below, the "Works" are the musical compositions and sound recordings to which MC Money, Gangsta Gold, or both contributed original expression for inclusion in the completed work. "Plaintiff Material" means a Plaintiff's original lyrics, songwriting, recorded vocal performances, and corresponding ownership interests embodied in a Work. "Covered Exploitations" means any reissue, license, clearance, settlement, distribution, administration, or other commercial use of a Work or Plaintiff Material, whether used directly or through one or more intermediate recordings. "Exploitation Proceeds" means all cash and non-cash consideration paid, credited, conveyed, or payable from Covered Exploitations, including license fees, settlements, royalties, advances, reissue income, publishing interests, royalty participations, and receivables. "Transaction Records" means the agreements, registrations, schedules, claim files, correspondence, statements, performing rights organization records, payment records, and other documents needed to identify Covered Exploitations and trace the resulting Exploitation Proceeds.

**B. The Phonk Market Made the Music Commercially Valuable**

24. Decades after the Album's original release, recordings associated with DJ Sound and the Frayser Click experienced an unexpected commercial resurgence. Contemporary phonk artists and producers began sampling underground Memphis recordings from the 1990s.

25. Modern recordings incorporated material from Works containing Plaintiffs' lyrics, voices, and performances. In many instances, Plaintiffs' material was the passage selected and repeated in the new recording.

26. The licensing market was largely reactive. Artists and producers often released sampled tracks before seeking clearance. Uses were scattered across global platforms, and the source audio was frequently slowed, sped up, pitch-shifted, filtered, chopped, looped, or otherwise altered.

27. Some uses were also layered. A Work containing Plaintiffs' material might be sampled into an intermediate recording that was later sampled again. Each layer could involve different contributors, but the additional sampling did not eliminate Plaintiffs' interests in their preexisting material.

28. Perry has publicly described finding one sampled track on a platform such as YouTube, reviewing other releases by the same artist, and following those leads to additional uses. Perry held himself out as the person authorized to clear older DJ Sound and Frayser Click material and directed users to obtain clearance through him. Upon information and belief, Perry then retained counsel who further investigated the sample chain and developed a process for identifying and tracking potential infringement claims.

29. Upon information and belief, Perry then settled many of these potential infringement claims with artists, record labels, and music publishers in exchange for: (a) a share of master revenue, paid through either a lump-sum buyout or a continuing royalty stream with a catch-up payment for past royalties; and (b) a percentage ownership interest in the copyright in the new composition. The transactions identified below are representative, not exhaustive. Perry and his counterparties possess the records needed to identify the remaining transactions and determine what Perry received.

## C. One Transaction Included a $100,000 Fee and Half the Publishing in Thirty New Songs

30. Upon information and belief, in or around February 2024, Perry, in his individual capacity, signed a written agreement with WHY Z MUSIC LLC covering at least thirty sample clearances for recordings by LXST CXNTURY and RHODAMINE.

31. The source material included multiple Works embodying Plaintiffs' writing and performances, including "I Just Need Yo Cheese" (five uses); "Load Da Ammo" (four uses);

"Ridgecrest Taking Over" (four uses); "Down With the Click" (three uses); and "Bout Our Hogg" (one use).

32. Upon information and belief, representative recordings covered by the agreement include LXST CXNTURY's "Space Attack," "War," "Kyoto," and "Lunacy." These recordings do not merely sample tracks with which Plaintiffs were associated. They reproduce and repeat Plaintiffs' actual vocal performances and, where those vocals embody Plaintiffs' lyrics or songwriting, their interests in the underlying compositions.

33. For example, "Space Attack" contains MC Money's vocals from approximately 0:20 to 1:33 and Gangsta Gold's vocals from approximately 1:34 to 2:01. "War" uses MC Money's vocals from the beginning through approximately 1:46; "Kyoto" uses Gangsta Gold's vocals from approximately 0:14 to 2:22; and "Lunacy" uses both Plaintiffs' vocals in multiple extended passages.

34. Upon information and belief, Perry purported to grant retroactive and prospective, perpetual, worldwide licenses covering the sampled sound recordings and compositions and to release claims arising from the licensees' prior uses.

35. The stated consideration included a $100,000 nonrecoupable master-use fee and a fifty-percent publishing interest in each covered new composition and its versions, together with administration and collection rights.

36. Upon information and belief, WHY Z MUSIC LLC and the licensees paid or credited that consideration, continued exploiting the covered recordings, and recognized or registered Perry's claimed publishing interests. Perry received or controlled all or a material part of the cash consideration and the publishing interests and income.

37. Perry did not recognize any share of those interests as belonging to Plaintiffs, compensate them for the portions attributable to their material, or provide the agreement, proof of payment, registrations, royalty records, or allocation methodology.

38. Upon information and belief, the publishing interests granted to Perry have separately yielded royalty payments in excess of $150,000.

***Perry's Relationship with the Black 17 Record Label and Publishing Affiliate***

39. Upon information and belief, Perry licensed numerous Works to Black 17 and to artists releasing through Black 17. Perry then entered into a publishing administration deal under which Black 17 would administer his entire copyright catalog as his exclusive licensing agent. Black 17 Media serves as Perry's publishing administrator and also operates as a record label and distributor in the modern phonk market.[3]

40. Black 17 publishes and distributes MC ORSEN's "Warning" and the separately released "Warning (Sped Up)" and "Warning (Slowed)." Each version samples "Glock-Tight Smoked-Out," a Work to which both Plaintiffs contributed.

41. By way of example, the sampled passages repeatedly feature Gangsta Gold's recorded voice. Her vocals appear in "Warning" at approximately 0:15 to 0:47 and 1:20 to 1:35, with corresponding passages appearing in the sped-up and slowed versions.

42. Upon information and belief, "Warning" and its separately released versions alone have generated well over one billion streams worldwide.

---

[3] *See* Andrea Prada Bianchi, *The Soundtrack of the Doomscroll Generation? It's Phonk.*, N.Y. Times (Feb. 23, 2026), https://www.nytimes.com/2026/02/23/arts/music/phonk-youtube-tiktok-music.html (describing Black 17's role in clearing and monetizing phonk recordings incorporating Memphis rap samples and reporting that its top 250 songs amassed more than one trillion streams and generated over $140 million in creator payments).

43. Upon information and belief, Perry, Black 17, or both entered into, administered, or benefited from licenses, clearances, settlements, publishing arrangements, or distribution agreements concerning “Warning.” Perry has not disclosed the complete terms, accounted for the resulting fees and income, or paid Plaintiffs all amounts attributable to their Work.

44. Furthermore, upon information and belief, Perry licensed recordings and compositions from the Album to record labels and publishers for use in dozens of other recordings, including KSLV Noah, “Midnight Shift”; Ghostface Playa, “Deadline”; ONIMANXD, “Riders”; Mista Playa, “Enemy and Revenge” and “Enemy and Revenge 2”; DVRST, “Dream Space” and “Dream Space Sped Up”; DVRST, “Transition to Reality”; and Ghostface Playa, “Daredevil.”

45. Upon information and belief, in exchange for these licenses, Perry received one or more of the following: substantial cash payments, rights to ongoing master royalties, and shares of the copyrights in new compositions embodying the samples.

**D. Perry Admitted He Owed Plaintiffs Money but Did Not Explain His Payments**

46. Shortly after the WHY Z MUSIC transaction, Perry told Plaintiffs that their older recordings were generating money through modern licensing, settlements, and other uses. He did not claim that Plaintiffs owned nothing. He acknowledged that they retained economic interests and were entitled to payment.

47. Perry then paid approximately $2,000 to MC Money and $2,000 to Gangsta Gold by cashier’s check. In or around 2025, he paid each Plaintiff approximately another $400.

48. Plaintiffs accepted those payments only as partial distributions. The payments came without any transaction-level accounting, release, settlement, ownership transfer, or completed reconciliation. Perry did not disclose the $100,000 master-use fee, the continuing publishing interests, or the method by which he calculated the payments.

49. Plaintiffs retained counsel to investigate. With Perry's participation and through his then-counsel, the parties began reconciling dozens of licenses and hundreds of uses involving the Works while also discussing settlement.

50. The reconciliation required the parties to identify each source recording and any intermediate recordings, determine the applicable ownership interests, match each use to a license or settlement, identify the consideration received, and calculate the amounts due.

51. Plaintiffs could identify some releases from public sources, but they could not obtain the underlying agreements, settlements, publishing interests, receipts, or allocations without Perry's cooperation and records.

**E. Perry Continued Exercising Control Over the Catalog**

***The Album Reissue***

52. While the accounting remained unresolved, Now-Again Records commercially reissued *Da Hard Ov Frayser* in physical and digital formats on or about October 15, 2024, without Plaintiffs' prior knowledge or approval.

53. The reissue prominently identified MC Money and Gangsta Gold as the artists, identified Perry as the producer, and stated "Licensed by DJ Sound." It also used Plaintiffs' professional names and likenesses to market and sell the Album.

54. Neither Plaintiff signed or approved a reissue agreement, authorized Perry to convey her ownership interests, or gave him exclusive authority over her material. Perry has not provided the reissue agreements, ownership schedules, royalty statements, or related records.

55. The reissue was part of Perry's broader exercise of control over the catalog. Perry presented himself to licensees as able to clear the sound recordings, compositions, samples, and performances without disclosing that Plaintiffs owned interests in the applicable Works or that

neither Plaintiff had authorized him to act for her. He accepted or controlled consideration from those transactions without providing a complete accounting or paying Plaintiffs all amounts attributable to their interests.

**F. Perry Ended the Accounting Before Disclosing What He Collected**

56. The accounting did not involve a closed set of transactions. New phonk uses continued to surface, and each had to be traced to its source, matched to any agreement, and included in the financial analysis.

57. While that work continued, Perry made additional payments through counsel of approximately $11,399.86 to Gangsta Gold and $11,247.90 to MC Money.

58. Including the earlier payments, Perry has paid approximately $13,799.86 to Gangsta Gold and $13,647.90 to MC Money, subject to confirmation against the underlying records. Plaintiffs credit those amounts against what is due.

59. None of those payments came with a complete accounting identifying the transactions and receipts from which the payments arose, the allocation method Perry used, or the total amount attributable to Plaintiffs. The payments therefore do not establish whether Perry paid all, most, or only a small fraction of what he owed.

60. The reconciliation ended before the parties completed a historical accounting or established a process for future uses. Upon information and belief, Perry terminated the lawyer handling the reconciliation, and the work stopped. Perry still has not provided a work-by-work, transaction-by-transaction accounting of the licenses, settlements, consideration, publishing interests, deductions, allocations, and payments.

61. Upon information and belief, shortly after the reconciliation ended, Perry told multiple music-industry participants that he would make no further payments to Plaintiffs arising from the Works or their exploitation. Plaintiffs learned of Perry's position in or about August 2026.

62. Perry's subsequent conduct was consistent with that reported position. Perry provided no further accounting information, made no further payments to Plaintiffs, and continued to exercise control over licensing and revenues associated with the Works.

**G. Perry Never Told Plaintiffs He Claimed Sole Ownership**

63. Perry did not plainly and expressly tell Plaintiffs during the original recording era or for decades afterward, that he alone owned the Works or that Plaintiffs owned nothing. The Album was released under Plaintiffs' names, Perry was separately identified as producer, and Plaintiffs sold copies and kept the proceeds without objection.

64. Perry did not provide Plaintiffs with any registration, ownership schedule, license, claim file, or royalty record asserting that he alone owned the Works. Plaintiffs had no access to any private record in which he may have asserted a position inconsistent with their ownership.

65. The 2024 reissue likewise did not identify Perry as the sole author or owner. It continued to identify MC Money and Gangsta Gold prominently as the artists and Perry separately as the producer.

66. Perry's statements and conduct in spring 2024 acknowledged rather than denied Plaintiffs' interests. He told Plaintiffs they were owed money, made partial payments, and participated in a reconciliation intended to determine what remained due.

67. The dispute over accounting and payment crystallized when the reconciliation ended and Plaintiffs learned in or about August 2026 that Perry had taken the position that he would make no further payments. That was the first time Perry communicated a position inconsistent with

Plaintiffs' asserted right to a continuing accounting and their respective shares of the proceeds. Any plain and express repudiation of Plaintiffs' copyright co-ownership reflected in Perry's later statements, conduct, or present position occurred within three years before this action was filed.

68. An actual controversy now exists over the parties' authorship and ownership of the Works, Perry's authority to license or release rights, the effect of the transactions he entered or administered, and his obligation to account for the resulting proceeds. Plaintiffs recognize Perry's creative, technical, and organizational contributions and do not seek ownership of material they did not create. They seek a declaration of their own rights, a complete accounting, payment of all amounts due, and appropriate relief for continuing or later-discovered uses of their material.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT OF JOINT AUTHORSHIP AND COPYRIGHT CO-OWNERSHIP

17 U.S.C. §§ 101, 103(b), 201(a); 28 U.S.C. §§ 2201–2202

69. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein.

70. Each Plaintiff contributed independently copyrightable expression to the Works. Their original lyrics and songwriting are protected expression in the musical compositions, and their original recorded vocal performances are protected expression in the sound recordings.

71. The parties intended those contributions to be combined into completed compositions and recordings and intended to regard the contributors as authors. The Album's billing under Plaintiffs' names, Perry's separate producer and engineer credit, Plaintiffs' control over their lyrics and performances, and the transfer of the masters and sales proceeds to Plaintiffs objectively show that intent.

72. Plaintiffs were not Perry's employees, did not create works made for hire, and never signed a copyright assignment in his favor.

73. As between Plaintiffs and Perry, and subject to the legitimate rights of other contributors, each Plaintiff is a joint author and copyright co-owner of each Work to which she contributed copyrightable expression and for which the contributors shared the required mutual intent.

74. Neither preexisting material incorporated into a Work nor later recordings that incorporate Plaintiff Material transfer or extinguish Plaintiffs' rights in their own contributions. Plaintiffs do not claim ownership of new or third-party material merely because it appears with theirs.

75. Perry has licensed, reissued, settled, and otherwise exploited the Works without recognizing the full extent of Plaintiffs' rights. An actual controversy therefore exists.

76. Plaintiffs are entitled to a declaration that each is a joint author and co-owner of the applicable Works; that neither transferred her interests to Perry; that Perry's producer role, custody of source recordings, and third-party dealings did not extinguish those interests; and that incorporation of Plaintiff Material into another recording did not transfer or extinguish Plaintiffs' rights in that material. Plaintiffs also seek the supplemental accounting and payment relief necessary to effectuate that declaration under 28 U.S.C. § 2202.

**COUNT II**
**ACCOUNTING AND RECOVERY OF PROCEEDS FROM JOINTLY OWNED COPYRIGHTS**
17 U.S.C. § 201(a); 28 U.S.C. §§ 2201–2202

77. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein.

78. Each Plaintiff is a copyright co-owner of the Works to which she contributed copyrightable expression and for which the contributors shared the required mutual intent.

79. Perry engaged in Covered Exploitations and received or controlled substantial Exploitation Proceeds.

80. A co-owner who exploits a jointly owned work or grants a nonexclusive license must account to the other co-owners for their shares of the resulting profits and consideration.

81. That duty reaches consideration Perry obtained for licensing Plaintiff Material directly or through one or more intermediate recordings; it does not give Plaintiffs ownership of unrelated new or third-party material.

82. The accounting must include cash and non-cash consideration, including fees, advances, settlements, royalties, publishing interests, royalty participations, administrative rights, receivables, releases, and other economic benefits.

83. Perry acknowledged Plaintiffs' right to share in the revenue, made partial payments, and joined an effort to reconcile the transactions. That effort ended without a complete accounting or full payment.

84. The Covered Exploitations include direct uses, layered samples, reissues, settlements, and continuing publishing arrangements. Perry and his counterparties control the records needed to identify and value them.

85. Perry has not provided an accounting identifying each transaction, the rights granted, the consideration received or receivable, claimed deductions, continuing interests, income collected, and allocation among the owners.

86. Plaintiffs are entitled to:

a. a complete accounting of all Covered Exploitations and resulting Exploitation Proceeds received, controlled, credited, or receivable by Perry;

b. determination of the portion due to each Plaintiff;

c. payment or conveyance of the money and property due, including publishing interests and other non-cash consideration;

d. prejudgment and post-judgment interest and appropriate relief preserving identifiable proceeds or property; and

e. credit for Perry's prior partial payments.

87. If an accounting is treated as a remedy rather than a separate claim, Plaintiffs seek the same relief under 28 U.S.C. § 2202 as necessary to effectuate the declaration requested in Count I.

## COUNT III
## BREACH OF IMPLIED-IN-FACT CONTRACT

88. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein.

89. Perry entered a separate implied-in-fact agreement with each Plaintiff through the parties' words, conduct, performance, and course of dealing.

90. Each Plaintiff supplied original lyrics, songwriting, and performances for commercial release. In return, the parties understood that Plaintiffs retained ownership and economic interests in the Works they helped create and that Perry's recording, engineering, production, or custody of source materials did not entitle him to keep all resulting revenue.

91. The parties further understood that, if Perry undertook a Covered Exploitation and received consideration attributable to a Plaintiff's interests, he would disclose the transaction, account for the consideration, and pay or convey the portion due to her.

92. Plaintiffs performed by creating and delivering their contributions for incorporation into the completed Works.

93. Perry later confirmed the agreements by telling Plaintiffs the music was generating revenue, acknowledging their right to payment, making partial distributions, and joining the reconciliation process.

94. These disclosure, accounting, and payment duties arise from Perry's separate agreements with Plaintiffs and are additional to the rights supplied by the Copyright Act.

95. Perry breached by withholding transactions and records, failing to account for all Exploitation Proceeds, failing to identify and convey Plaintiffs' portions of publishing interests

and other non-cash consideration, and failing to pay all amounts due. Plaintiffs suffered damages in an amount to be proved, less credit for the partial payments received.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

96. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein. This Count is pleaded in addition to, and where necessary in the alternative to, their contract claim.

97. Perry undertook to negotiate, license, clear, settle, collect, and administer Covered Exploitations. He held himself out as able to clear rights extending beyond his own and accepted consideration attributable to Plaintiffs' interests.

98. No later than spring 2024, Perry told Plaintiffs their music was generating revenue, acknowledged that they were entitled to payment, made partial distributions, and undertook to reconcile the transactions and amounts due.

99. Plaintiffs relied on that undertaking by accepting the payments as partial distributions, retaining counsel, and participating in the reconciliation with the understanding that Perry would disclose the transactions and account for what he had received or controlled.

100. Perry had superior and substantially exclusive access to the licenses, settlements, registrations, statements, payment records, publishing interests, and other Transaction Records. Plaintiffs depended on him to disclose those records and safeguard the consideration attributable to their interests.

101. By accepting that responsibility and controlling property attributable to Plaintiffs, Perry assumed fiduciary duties no later than spring 2024. Those duties arose from his undertaking and control, not merely from collaboration or copyright co-ownership.

102. The undertaking covered Exploitation Proceeds and records then in Perry's control and any he later received.

103. Perry owed duties of loyalty, good faith, full disclosure, accurate recordkeeping, protection of Plaintiffs' property, avoidance of undisclosed self-dealing, and timely payment or conveyance of what was due.

104. Perry breached those duties by failing to disclose licensing, settlement, reissue, publishing, royalty, and collection activity; failing to identify all Exploitation Proceeds; failing to allocate or remit Plaintiffs' portions of cash and non-cash consideration; withholding Transaction Records; ending the reconciliation; and retaining property attributable to Plaintiffs.

105. Despite acknowledging Plaintiffs' interests and undertaking to account, Perry continued to withhold material information and exercise exclusive control over the proceeds and records.

106. As a result, Plaintiffs suffered damages in an amount to be proved and are entitled to compensatory damages, disgorgement, punitive damages upon the required showing, and other appropriate relief.

**COUNT V**
**UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED**
(Pleaded in the Alternative)

107. Plaintiffs incorporate the preceding allegations and plead this Count in the alternative under Federal Rule of Civil Procedure 8(d) if no enforceable contract or fiduciary relationship governs some or all of the consideration at issue.

108. Plaintiffs conferred substantial benefits on Perry by contributing valuable writing and performances to recordings over which he later exercised possession and licensing control.

109. Perry knew of those benefits and obtained cash, publishing interests, royalty participations, releases, and other Exploitation Proceeds by purporting to license, clear, release, or administer material that included Plaintiffs' interests.

110. That consideration was not paid solely for Perry's individual contributions. It was paid, in whole or in material part, for rights in Works and Plaintiff Material.

111. Perry acknowledged Plaintiffs' right to share in the proceeds and made partial distributions, but he has not disclosed or paid all amounts and interests attributable to them.

112. Whether Perry possessed authority to act or merely represented that he did, equity does not permit him to obtain consideration for Plaintiffs' interests and keep it all.

113. Any identifiable money or property received or controlled for Plaintiffs' interests is money or property had and received that belongs, in the proper proportion, to Plaintiffs.

114. This Count does not seek recovery merely because copyrighted expression was reproduced or distributed. It seeks restitution of consideration Perry obtained by purporting to license, release, settle, collect, or administer rights extending beyond his own.

115. Plaintiffs are entitled, as applicable, to restitution, money had and received, disgorgement, a constructive trust or equitable lien over identifiable property, and other appropriate relief.

**COUNT VI**
**FALSE ASSOCIATION AND FALSE ENDORSEMENT**
**15 U.S.C. § 1125(a)(1)(A)**

116. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein.

117. "MC Money" and "Gangsta Gold," individually and together as "MC Money & Gangsta Gold," are Plaintiffs' professional artist names. Through longstanding use on recordings and performances, including *Da Hard Ov Frayser*, the names have acquired secondary meaning and goodwill and identify Plaintiffs and their authorized music and services.

118. That goodwill remains valuable. Perry has publicly acknowledged that Plaintiffs retain a continuing "fan base" and that he receives direct messages from listeners asking "whatever

happened to MC Money and Gangsta Gold."[4] Those recurring inquiries demonstrate that Plaintiffs' professional names remain recognizable to consumers and retain goodwill and promotional value. Perry had actual knowledge of those facts.

119. The 2024 reissue included redesigned packaging, newly manufactured physical editions, and renewed digital distribution. It used Plaintiffs' exact names and likenesses as its dominant artist branding and identified Perry as the person from whom the release was "Licensed."

120. Upon information and belief, Perry authorized, approved, supplied materials for, or otherwise caused that use by purporting to license the Album for renewed manufacture, distribution, promotion, and sale.

121. Plaintiffs did not authorize the reissue, approve its presentation, endorse Perry's licensing activity, or give him authority to exploit their names, likenesses, or goodwill. Any copyright interest Perry may hold does not give him ownership of Plaintiffs' identities or authority to imply their approval.

122. Using Plaintiffs' exact names as the principal branding for newly manufactured music sold through the same channels where consumers encounter Plaintiffs' work was likely to suggest that Plaintiffs authorized, sponsored, approved, or participated in the reissue, or that Perry had authority from them to license it.

123. Perry acted knowingly. He knew Plaintiffs' names retained goodwill, knew they had not authorized him to exploit their identities, and used or caused those names to be used in a transaction from which he received or expected consideration.

---

[4] *See* Mr. Zee's, *DJ Sound Ep. 10: Giving Out Free Game*, YouTube, at 17:00–17:49 (Sept. 17, 2023), https://www.youtube.com/watch?v=hd3A-J9FDkY.

124. The conduct has caused or is likely to cause confusion about whether Plaintiffs were affiliated with Perry or sponsored or approved the reissue. It has also deprived Plaintiffs of control over their identities and goodwill and diverted commercial opportunities.

125. This Count is not based on reproduction of copyrighted expression or disputed authorship credit. It challenges the separate use of Plaintiffs' names and identities to signify source, affiliation, sponsorship, or approval in the sale of commercial goods.

126. Perry's conduct constitutes false association and false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A).

127. Plaintiffs are entitled to injunctive relief, Perry's profits attributable to the violation, actual damages, corrective relief, costs, interest, attorneys' fees to the extent authorized, and other appropriate relief under 15 U.S.C. §§ 1116–1118.

## COUNT VII
## COMMON-LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION
### Tennessee Common Law

128. Plaintiffs incorporate by reference the preceding allegations as though fully set forth herein.

129. Through prior and longstanding use of "MC Money," "Gangsta Gold," and "MC Money & Gangsta Gold" for recordings, performances, and related activities, Plaintiffs acquired Tennessee common-law rights and goodwill in those names. The names identify Plaintiffs and their authorized music and services.

130. Without authorization, Perry used or caused the use of Plaintiffs' exact names and likenesses as the dominant artist branding for newly manufactured, promoted, distributed, and sold editions of *Da Hard Ov Frayser*, while presenting himself as the source of the license.

131. That use was likely to make consumers believe Plaintiffs authorized, sponsored, approved, or participated in the reissue, or that Perry was authorized to act for them. The risk was especially

strong because the exact names appeared on the very music and goods with which consumers associate Plaintiffs.

132. Plaintiffs did not approve the reissue, its packaging, marketing, or presentation, or authorize Perry to use or license their names, likenesses, or goodwill. Any copyright interest Perry may hold does not grant those rights.

133. Perry knew Plaintiffs' names retained commercial recognition and knew they had not authorized his use. His conduct was knowing and intentional.

134. Perry's conduct constitutes trademark infringement and unfair competition under Tennessee common law and has injured Plaintiffs by impairing their goodwill, control over their identities, and commercial opportunities.

135. This Count protects Plaintiffs' names and source-identifying goodwill and is distinct from their copyright claims. Plaintiffs do not seek duplicative recovery under this Count and Count VI.

136. Plaintiffs are entitled to injunctive relief, compensatory damages, disgorgement of attributable profits, punitive damages upon the required showing, costs, interest, and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Perry and respectfully request that the Court grant the following relief, without duplicative recovery for the same injury under more than one Count:

i. A declaration that Plaintiffs are joint authors and copyright co-owners of the applicable Works; that neither transferred her interests to Perry; that incorporation of Plaintiff Material into another recording did not transfer or extinguish those rights; and such further relief as is necessary under 28 U.S.C. § 2202;

ii. Actual and compensatory damages, including unpaid amounts and ownership interests due under the parties' agreements and applicable law, damages caused by Perry's fiduciary breaches, and damages caused by the unauthorized use of Plaintiffs' names;

iii. In the alternative, restitution, disgorgement, recovery of money had and received, and appropriate relief concerning identifiable property obtained for or attributable to Plaintiffs;

iv. A complete accounting of all Covered Exploitations and resulting Exploitation Proceeds, including direct and intermediate uses, cash and non-cash consideration, publishing interests, registrations, receipts, deductions, receivables, and prior payments;

v. Determination and payment or conveyance of the consideration due to each Plaintiff, including assignment and conveyance of each Plaintiff's proportionate share of the publishing interests, royalty participations, and other non-cash consideration obtained through Covered Exploitations, with credit for prior partial payments;

vi. Appropriate prospective relief requiring Perry to disclose future Covered Exploitations and remit the portions due to Plaintiffs;

vii. Where appropriate, a constructive trust or equitable lien over identifiable money, receivables, copyright or publishing interests, royalty participations, and other property obtained through Covered Exploitations;

viii. An order requiring Perry to correct, and to join in correcting, copyright registrations, performing rights organization registrations and works records, publishing-administration records, and related third-party records to reflect Plaintiffs' interests, and to direct payors to remit Plaintiffs' shares accordingly;

ix. Preliminary and permanent injunctive relief under 15 U.S.C. § 1116 and Tennessee common law barring Perry and those acting with him from using or licensing Plaintiffs' names,

likenesses, or goodwill in a manner likely to cause confusion regarding source, affiliation, sponsorship, or approval, or from falsely representing that Perry may authorize such use;

x. Perry's profits attributable to the unauthorized use of Plaintiffs' names, Plaintiffs' actual damages, and costs under 15 U.S.C. § 1117(a) and Tennessee common law;

xi. Corrective relief, including delivery up and destruction of infringing packaging, artwork, advertising, and promotional material under 15 U.S.C. § 1118;

xii. Punitive damages to the extent permitted by law;

xiii. Costs, prejudgment and post-judgment interest, and attorneys' fees to the extent authorized by law; and

xiv. Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 28, 2026

Respectfully submitted,

/s/Jonathan M. Wolf

Jonathan M. Wolf (#35445)
Jonathan M. Wolf, PLLC
1515 Demonbreun St., Suite #1408
Nashville, TN 37203
615-422-5545
Jonathan@wolf.lawyer

*Counsel for Plaintiffs Christy Coran and Latonya Pierce*

**VERIFICATION**

I, Christy Coran p/k/a "Gangsta Gold," have read the foregoing Verified Complaint. The factual allegations concerning me and matters within my personal knowledge are true and correct. I believe the allegations expressly stated on information and belief to be true based on the information presently available to me. I declare under penalty of perjury that the foregoing is true and correct.

Christy Coran p/k/a "Gangsta Gold"
Christy Coran p/k/a "Gangsta Gold" (Sep 25, 2026 11:55:58 CDT)

Christy Coran

Executed on: 25/09/2026

**VERIFICATION**

I, Latonya Pierce p/k/a "MC Money," have read the foregoing Verified Complaint. The factual allegations concerning me and matters within my personal knowledge are true and correct. I believe the allegations expressly stated on information and belief to be true based on the information presently available to me. I declare under penalty of perjury that the foregoing is true and correct.

Latonya Pierce p/k/a "MC Money"
Latonya Pierce p/k/a "MC Money" (Sep 25, 2026 11:44:15 CDT)

Latonya Pierce

Executed on: 25/09/2026